# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2022

Lyle W. Cayce
Clerk

No. 21-20085

Melinda Abbt,

*Plaintiff—Appellant*,

*versus*

City of Houston; John Chris Barrientes,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-1353

Before King, Graves, and Ho, *Circuit Judges*.
King, *Circuit Judge*:

Melinda Abbt, who formerly worked as a firefighter in the Houston Fire Department, appeals the district court's grant of summary judgment dismissing her claims for sexual harassment and retaliation against the City of Houston related to the repeated viewing of a private, intimate video of Abbt by two senior firefighters. While we agree that there is no genuine dispute of material fact as to Abbt's retaliation claim, we disagree with the district court's conclusion that no genuine issue exists as to her sexual harassment claim and that summary judgment for the City was appropriate. We therefore AFFIRM in part and REVERSE in part.

No. 21-20085

## I.    FACTS & PROCEDURAL HISTORY

Beginning in 2003, Melinda Abbt worked for the City of Houston as a firefighter in the Houston Fire Department. From 2006 until 2009, she was assigned to Station 18. During that time, she served under Chris Barrientes, who was a Junior Captain at Station 18. Station 18 was overseen by District Chief David Elliott, who also had purview over three to four other stations.

According to Barrientes's deposition testimony, the actions which led to this case began around 2008, when Barrientes received an anonymous e-mail. That e-mail contained an intimate, nude video of Abbt that she had made privately for her husband and had saved on her personal laptop, which she had brought to the fire station.[1] Barrientes first watched the video in the captain's office of Station 18. He kept the video's existence hidden for several days, and then brought it to the attention of District Chief Elliott.

When Barrientes told Elliott about Abbt's nude video, Elliott asked to see it. Barrientes then played the video for Elliott; another firefighter, Jonathan Sciortino, testified that he was also in the room and viewed the video.[2] Barrientes testified that, when he asked Elliott what to do, Elliott first asked "if [Barrientes] had told anybody" about the video. When Barrientes said he had not, Elliott responded that was "good," that Barrientes should not discuss the video with anyone else, and that Elliott would "get back to [Barrientes]" about what to do.

---

[1] While Barrientes's testimony is that he received the video in an anonymous e-mail, it is unclear whether this was actually how Barrientes obtained it. For example, Elliott "reported to [the Office of Inspector General]" that Barrientes had downloaded the video himself from Abbt's personal laptop. However, the source of the video is irrelevant to Abbt's claims, which stem from actions taken after Barrientes possessed the video.

[2] Barrientes testified that he did not remember Sciortino being present when Barrientes showed the video to Elliott.

No. 21-20085

Elliott did not report the video to human resources or to a supervisor. Instead, Elliott "asked [Barrientes] to forward [the video] to him" because Elliott "wanted to see it again." Barrientes did not forward the e-mail at that time, but provided his e-mail password to Elliott so that Elliott would have access to the video. A year or so later, Elliott called Barrientes because the password to Barrientes's account no longer worked and Elliott needed the new one to continue watching the video. According to Barrientes, Elliott said he was "going to keep hounding [Barrientes] till [he gave Elliott] the password or let [him] see the video again." Barrientes then forwarded the video to Elliott. Barrientes also continued to watch the nude video of Abbt multiple times over the next several years.

Abbt learned of these events on May 18, 2017, when Elliott confessed to Abbt's husband (also a member of the Fire Department) that Elliott had seen a nude video of Melinda Abbt. Upon learning that her personal, intimate video had been seen by other firefighters, Abbt was "completely distraught" and "disgusted." She called in sick the next day and continued to call in sick in the weeks that followed. On June 6, 2017, Abbt was diagnosed with post-traumatic stress disorder (PTSD) by Dr. Jana Tran, a therapist with the City. After the incident, Abbt received six months of unpaid leave under the Family and Medical Leave Act (FMLA); however, she was initially denied paid leave. Abbt filed a worker's compensation claim on February 16, 2018, which was opposed by the City; an Administrative Law Judge found that Abbt had suffered "a compensable mental trauma injury" and she was granted worker's compensation pay. She was medically separated from the City and her employment ended on February 12, 2019.[3]

---

[3] This decision was made by the Fire Fighters' & Police Officers' Civil Service Commission after a determination that Abbt "had a medical impairment" that could not

No. 21-20085

Abbt also reported the incident to the City of Houston's Staff Services Department and, on May 26, 2017, she filed a complaint with the Houston Office of Inspector General (OIG). When he learned of the investigation, Barrientes deleted the original e-mail from his e-mail account; it is unclear whether he additionally deleted the e-mail he sent to Elliott or whether he retained that copy of the video. The OIG eventually sustained Abbt's allegations. Barrientes, Elliott, and Sciortino each received suspensions of varying length;[4] Barrientes also received a two-rank demotion. However, Abbt asserts that, after the investigation, (1) she was not told how widely the video had been distributed throughout the Fire Department, (2) she did not know whether any copies of the video continued to exist and were still in the possession of others, and (3) there were no assurances that Abbt would not be required to work in the future with Barrientes or Sciortino (both of whom she knew had seen the video and were still working for the Fire Department).

After receiving the results of her OIG complaint, Abbt filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission—Civil Rights Division. She alleges that, after she told a counselor with the City's Employee Assistance Program of her intention to file charges, the counselor responded that Abbt would "see how things change." Approximately six weeks after Abbt filed her charges of discrimination, a City attorney called Abbt's therapist, Dr. Tran, and "asked if she could 'dissuade' [Dr. Tran]" from continuing to treat Abbt since Dr. Tran, as a Fire Department staff psychologist, had "the dual role of representing the [Fire] Department and representing the client."

---

be accommodated. Abbt was told that she could reapply should her medical condition improve.

[4] Elliott retired from the Fire Department in lieu of serving his suspension.

No. 21-20085

Dr. Tran ultimately continued treating Abbt after consulting with another psychologist.

Abbt later filed a lawsuit in state court alleging sexual harassment that created a hostile work environment, retaliation by the City of Houston, and violations of Texas Civil Practices and Remedies Code § 98B.002 (Unlawful Disclosure or Promotion of Certain Intimate Visual Material) against Barrientes and the City. The case was removed to federal court and the City moved for summary judgment on Abbt's sexual harassment and retaliation claims.

The district court first struck several paragraphs from the declaration Abbt introduced to support her claims, concluding that various parts of the declaration were "based on speculation and rumors," "based on hearsay," and/or "clearly contrary to her prior statements, collective bargaining agreements, and fire department policies." The court did not identify which of the struck paragraphs corresponded to which deficiencies.

The district court then granted summary judgment to the City on both Abbt's sexual harassment claim and her retaliation claim. It first found that Abbt's sexual harassment claim failed because no hostile work environment was created as (1) neither Barrientes nor Elliott were Abbt's supervisors, and so the City could not be held vicariously liable for their actions; (2) "it was [Abbt's] knowledge of what had happened that led to her purported PTSD, not the actual conduct of her coworkers viewing the video;" (3) Abbt was unable to prove that the theft of the video occurred at work; and (4) the City took sufficient remedial action once Abbt filed a complaint with the OIG. The court ultimately stated that "[b]ecause Abbt cannot show that she was subjected to a hostile work environment – just that she is angry and embarrassed – her sexual harassment claim fails."

No. 21-20085

As to Abbt's retaliation claim, the court granted summary judgment to the City because (1) the denial of Abbt's request for paid leave followed the City's worker's compensation policies, and Abbt later was granted full backpay after filing her worker's compensation claim; (2) "[t]he City was within its right to deny [Abbt's] transfer and work-from-home requests[;]" and (3) Abbt's "allegation that the City tried to persuade [Dr.] Tran is inadmissible and cannot support her retaliation claim." The district court then remanded Abbt's state-law claims. Abbt timely appeals the district court's summary judgment in favor of the City.

## II.    Discussion
### A. Stricken Paragraphs from Abbt's Declaration

As an initial matter, we must consider the district court's decision to strike several paragraphs from the declaration Abbt submitted in support of her claims and in response to the City's motion for summary judgment. Such evidentiary rulings are reviewed for abuse of discretion. *Cohen v. Gilmore* (*In re Ala. & Dunlavy, Ltd.*), 983 F.3d 766, 774 (5th Cir. 2020). A court can abuse its discretion "by failing to explain the reasons for excluding evidence." *Id.* Abbt contends that the district court abused its discretion because, while it provided a list of reasons why the stricken paragraphs in general were deficient, it did not match those reasons to the specific paragraphs or explain how or why each paragraph represented incompetent summary-judgment evidence. However, we need not consider whether the district court abused its discretion because the answer to that question will not affect the result of this case. Whether or not we consider the stricken paragraphs, we come to the same result—reversing summary judgment as to Abbt's sexual harassment claim but affirming summary judgment as to her retaliation claim. Abbt's sexual harassment claim survives even without the stricken

6

paragraphs, and none of the stricken evidence saves her retaliation claim as a matter of law.

## B.  Standard of Review

A district court's grant of summary judgment is reviewed de novo. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 (5th Cir. 2006). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that could ultimately "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard applies to the district court's summary judgment on both claims. We first consider Abbt's sexual harassment claim, and then turn to her retaliation claim.

## C.  Sexual Harassment

The district court considered Abbt's sexual harassment claim to be a federal-law claim under Title VII premised on the existence of a hostile work environment; we do the same here. A work environment is considered hostile when it is "objectively and subjectively offensive" such that "a reasonable person would find [it] hostile or abusive" and the victim herself "perceive[d] [it] to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The hostility of a given work environment is determined based on the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

To prove a hostile work environment claim, the plaintiff must prove that she is (1) a member of a protected class who was (2) subject to

"unwelcome harassment" that was (3) based on the plaintiff's status as a member of a protected class (here, sex) and was (4) "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and that (5) "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). An employer can be put on notice of harassment, and therefore be required to take remedial action, if a person within the organization who has the "authority to address the harassment problem" or an "affirmative duty" to report harassment learns of the harassment in question. *Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir. 1998).

There is at least a genuine dispute of material fact for each element of Abbt's sexual harassment claim. It is undisputed that Abbt, a woman, is a member of a protected class. It is also undisputed that Abbt experienced unwelcome harassment—Abbt did not send Barrientes the video and did not give either Barrientes or Elliott permission to watch it. It is important to note that the unwelcome harassment was not limited to the theft of the video. Instead, the harassment includes the affirmative decision by Barrientes and Elliott to repeatedly view Abbt's intimate video without her permission. Abbt has presented evidence that both Barrientes and Elliott watched the video at work, watched it multiple times, and watched it with the full knowledge that it depicted their female subordinate nude. The full framing of the harassment at issue in this case includes the repeated viewing of the video, not just its theft.

Given that framing, the harassment (the repeated viewing of the video) was based on sex, and therefore was based on Abbt's status as a member of a protected class. The textbook example of harassment stems from actions across genders based on sexual desire. The Supreme Court has

therefore noted that "[c]ourts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). It is for this reason that the Supreme Court needed to clarify that "harassing conduct *need not be motivated by sexual desire* to support an inference of discrimination on the basis of sex." *Id.* (emphasis added). The Supreme Court has made clear that a sexual motivation is not necessary to find sexual harassment; but even though such a motivation is not necessary, it is still clearly sufficient. And a jury could surely find that the decision of two men to repeatedly watch a nude video of their female coworker was motivated by the fact that she was a woman. The harassment was based on sex.

The next element to consider is whether the harassment was severe or pervasive enough to create an abusive and hostile work environment and alter a term or condition of Abbt's employment. This element is disjunctive—if a single instance of the conduct (here, the viewing of the video) was severe enough on its own to create a hostile work environment, then it need not have been pervasive for this element to be satisfied. *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435 (5th Cir. 2005) ("The Supreme Court has stated that isolated incidents, if egregious, can alter the terms and conditions of employment."). This prong of the test has both an objective and subjective element—we consider whether a reasonable person would have found that the harassment created a hostile work environment and also whether the harassment created a hostile work environment for the plaintiff herself.

Abbt has presented sufficient evidence to create a genuine dispute of material fact as to this prong. First, the complained-of conduct is sufficiently severe to objectively create a hostile work environment. Looking to "all the

No. 21-20085

circumstances," *Faragher*, 524 U.S. at 787 (quoting *Harris*, 510 U.S. at 23), a reasonable person could consider the repeated viewing of her intimate, nude video by her coworkers to be sufficiently severe to constitute sexual harassment. Such invasive and violative conduct goes well beyond a "mere offensive utterance" and rendering it actionable under Title VII does not risk turning the statute into a "general civility code." *Id.* at 787. Barrientes and Elliott's conduct was not only a clear violation of Fire Department policy but, in Barrientes's case, was also potentially a crime under Texas law. *See* Tex. Penal Code § 21.15(b)(3) (criminalizing the distribution of nude photographs or videos of a person "without the other person's consent and with intent to invade the privacy of the other person"). The conduct was objectively offensive, and could have objectively created a hostile work environment.

In addition, the conduct was subjectively offensive to Abbt and affected a term or condition of her employment. After learning that Barrientes and Elliott had repeatedly watched an intimate video of her nude, she developed PTSD and was unable to return to work. Abbt additionally did not know, and still does not know, how far and wide the video had spread throughout the Fire Department. What she did know was that, as a firefighter living in a firehouse, she would be required to eat, sleep, and live with other firefighters while on duty. Therefore, she would be returning to a work environment where she could be sleeping and living next to a person who had seen her intimate video. She would be returning to a work environment with no assurances that she would not have to work with or sleep next to Barrientes, who she *knows* had repeatedly watched her nude video. She would be returning to a work environment with no guarantees that copies of her intimate video were not still being shared amongst her coworkers. These possibilities stem directly from the harassment at issue, and subjectively affected Abbt's employment by preventing her return to work.

The district court discounted these possibilities by noting that "it was [Abbt's] knowledge of what had happened that led to her purported PTSD, not the actual conduct of her co-workers viewing the video." But that fact does not control; we decline to hold as a matter of law that a person must contemporaneously experience harassment for it to be actionable under Title VII. As discussed above, the term or condition of Abbt's employment that was affected by the harassing conduct was her inability to return to work. A term or condition of her employment was thus affected, as this is not a case where the victim had already retired or left the company, which would leave no possibility that a term or condition of employment could ever be affected.

Abbt wanted to return to her work as a firefighter in the Houston Fire Department, but was unable to because of the fear that she might have to work with Barrientes (who had watched her intimate video) and other coworkers who might have also been shown or sent the video. That fear began to exist when Abbt learned about Barrientes and Elliott's actions, and still exists today regardless of when those actions actually occurred. True, the largest harm that Abbt suffered (her PTSD), which had the largest effect on her employment (which she could not return to), actually began to manifest when Abbt learned of the repeated viewings of her intimate video. But the actual viewing of that video was a necessary prerequisite to Abbt learning of those viewings and suffering harm. After all, had Barrientes and Elliot not repeatedly watched her intimate video, there would have been no harassment for Abbt to discover. And the pain the harassment caused is logically just as real and viscerally felt whether Abbt learned of the actions immediately (by, say, walking in on a viewing), days later, or decades later. Nothing about the time elapsed could do anything to diminish the harm caused by the harassment, the PTSD it caused, or the effect it had on her ability to return to work. Whether that harm can support a hostile work environment claim is

a question for a jury, not a judge.[5] *See Hirase-Doi v. U.S. West. Commc'ns., Inc.*, 61 F.3d 777, 782–83 (10th Cir. 1995); *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1505 (M.D. Fla. 1995) ("The extent of [the victims' knowledge] of [the harassing] activities and how this knowledge affected their perception of their working environments at different times is a question of fact.").

Lastly, Abbt has presented sufficient evidence to create a genuine dispute as to whether the City knew or should have known about the harassment, and thus can be held liable. In *Williamson v. City of Houston*, our court held that "[i]f the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable." 148 F.3d 462, 467 (5th Cir. 1998). In the instant case, that individual was Elliott, a District Chief at the time. *Williamson* involved the Houston Police Department which, just like the Houston Fire Department, featured "a strong chain of command." *Id.* at 466. Just like the supervisor in *Williamson*, Elliott "could have directed [Barrientes] to cease his harassing behaviors, and [Barrientes] would have been subject to discipline for failing to obey." *Id.* As in *Williamson*, "if [Elliott] failed to report harassment of which he was aware to his superiors, he was breaching an affirmative duty of his position." *Id.* Therefore, in our case as in *Williamson*, "[t]he City is hard pressed to explain why [a supervising employee's] knowledge of harassment should not be imputed to the City when its own policy placed an affirmative duty on him

---

[5] We additionally note that, at bottom, Title VII exists to "root out discrimination in employment." *EEOC v. Shell Oil Co.,* 466 U.S. 54, 77 (1984); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 764 (1998); *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 (1995). That purpose would be ill-served should we state that, as a rule of law, objectively harassing and humiliating actions, if successfully hidden for a period of time, automatically become unactionable.

to pass such information up the chain of command." *Id.* Our case fits squarely under our precedent in *Williamson*; therefore, that case's holding controls and "notice to [Elliott] can be imputed to the City of Houston for purposes of liability under Title VII." *Id.* at 467.

There is a genuine dispute of material fact for every element of Abbt's sexual harassment/hostile work environment claim. Summary judgment was therefore improper, and we reverse the grant of summary judgment to the City of Houston.

## D. Retaliation

Abbt also filed a claim against the City for retaliation, which the district court also considered under Title VII. "There are three elements to a *prima facie* case of retaliation under Title VII: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). In addition to tangible adverse actions, such as firing an employee, the definition of adverse employment action includes any act which "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). If the plaintiff succeeds in satisfying these elements, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). "The employer's burden is one of production, not persuasion, and involves no credibility assessment." *Id.* "If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual

retaliatory reason." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

It is undisputed that Abbt engaged in a protected activity under Title VII when she filed a complaint with the OIG and a charge with the EEOC. This case therefore turns on whether Abbt can point to retaliatory actions taken by the City for which it cannot offer a legitimate, non-retaliatory explanation.

She cannot. Abbt points to two actions taken by the City which she claims were retaliatory: (1) the fact that the City denied Abbt paid leave for over a year and opposed her worker's compensation claim, and (2) the phone call a City attorney made to Abbt's therapist, Dr. Tran, to try to convince her to cease treating Abbt. However, the City proffered legitimate reasons for each action, and Abbt has not offered proof that those reasons were pretextual.

Abbt first asserts that she was entitled to paid leave because the City often granted paid leave to employees who were being investigated, and thus denying Abbt paid leave left her, a victim of alleged harassment, worse off than alleged perpetrators of misconduct. The City responded that, under its policies, Abbt was not entitled to paid leave, and therefore the City was under no obligation to provide it to her. The City's explanation provides a nonretaliatory reason for its decision to deny paid leave; an employer does not retaliate by following its own policies without singling out the complainant or enforcing that policy in a retaliatory manner. *Cf. Feist v. Louisiana*, 730 F.3d 450, 455 (5th Cir. 2013) (stating that evidence of retaliation can include "an employer's departure from typical policies and procedures"). Further, the City opposed her worker's compensation claim based on a colorable argument that Abbt's claim was time-barred, and paid her backpay when an Administrative Law Judge issued a contrary decision.

14

Abbt has presented no evidence that she was entitled to paid leave, or that the City took its actions to retaliate and is now offering pretextual explanations.

Similarly, the City offered a legitimate explanation for the phone call placed to Dr. Tran. In its reply brief at the summary-judgment stage, the City stated that "the attorney's reasons for approaching Dr. Tran was due to Dr. Tran's perceived dual role of being a representative of both the City and [Abbt]." That explanation is plausibly supported by Dr. Tran's description of the phone call in her chart notes and is a legitimate explanation for the City attorney's actions. Abbt has not responded with any evidence demonstrating that this explanation is pretextual. By proffering the "dual role" explanation, the City has met its burden; Abbt has failed to meet her burden of demonstrating pretext. The same is true for the City's denial of paid leave and contestation of Abbt's worker's compensation claim. Because the City has offered legitimate explanations for its allegedly retaliatory actions which have not been shown to be pretextual, summary judgment for the City was appropriate. We affirm the district court's grant of summary judgment on Abbt's retaliation claim.

## III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part and the case is REMANDED for further proceedings consistent with this opinion.

No. 21-20085

JAMES C. HO, *Circuit Judge*, concurring:

Melinda Abbt is a firefighter. But at least two of her male superiors at the Houston Fire Department—Chris Barrientes and David Elliott—and perhaps countless others treated her as nothing more than a sexual object. They accessed a private, intimate, nude video that Abbt had obviously made exclusively for her husband. They did so without her knowledge or permission. And they watched it repeatedly, both on and off-duty, alone and in front of co-workers, *for over nine years*. The only reason Abbt ever discovered this most invasive violation of privacy was because Elliott finally confessed to her husband. Even to this day, Abbt cannot be sure whether anyone else at the Department has already seen the video—or may watch it in the future.

These are disturbing facts. Even the City of Houston admits that Barrientes and Elliott were guilty of "morally reprehensible" conduct.

The question before us, of course, is not whether this behavior was immoral, but whether it is actionable under Title VII of the 1964 Civil Rights Act. But I agree that the district court should have treated this misconduct as unlawful as well as disgraceful.[1]

\* \* \*

To be sure, we normally think of sexual harassment as something done *to* you—not behind your back, as is the case here. After all, it is bedrock sexual harassment law under Title VII that "a sexually objectionable

---

[1] And as if we needed another creepy fact about this case: Our decision today is only the latest addition to a string cite of "peeping tom" cases under Title VII. *See*, *e.g.*, *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494 (M.D. Fla. 1995); *Ciesielski v. Hooters of Am., Inc.*, 2004 WL 1699020 (N.D. Ill. July 28, 2004); *Cottrill v. MFA, Inc.*, 443 F.3d 629 (8th Cir. 2006); *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607 (E.D. Va. 2011).

environment must be both objectively and subjectively offensive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

The theoretical challenge in this case is the subjective element. Because a plaintiff cannot "in fact . . . perceive" conduct as hostile if they are unaware of it. *Id.* And "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

But notably, the City conceded at oral argument that Abbt's work environment was subjectively hostile. And rightly so.

That's because Abbt was *still working* at the Department when she learned what her superiors had been doing behind her back. It is a curious consequence of Title VII sexual harassment doctrine that her hostile work environment claim would not have been viable had she learned of the misconduct only *after* she left the Department. But it's one that Abbt's counsel acknowledges, and the court today affirms. Because then, the conditions of her employment would not have been altered. *See id.*; *see also, e.g.*, *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) (explaining that incidents "made known to" a plaintiff only "after her termination . . . could not have contributed to her subjective view of a hostile environment"). But that's not a problem here, because there's no dispute that Abbt was employed at the Department at the time she learned of the misconduct.

It seems obvious how a rational jury could find that Abbt's discovery of the misconduct "actually altered the conditions of [her] employment" and caused a subjectively hostile work environment. *Harris*, 510 U.S. at 21–22. By all indications, Abbt would have wanted to continue to work at the Department—but for multiple reasons no longer felt comfortable doing so.

No. 21-20085

For one, as the court today notes, Abbt had "no assurances that she would not have to work with or sleep next to Barrientes, who she *knows* had repeatedly watched her nude video." *Ante*, at 11.

What's worse, Abbt had no way of knowing whether *anyone else* at the Department had ever seen—or would continue to watch—her video. She certainly got no assurance from Barrientes, who admitted in his deposition testimony that he did not know whether or not he had deleted every copy of the video from his email account.

Abbt's fear of the unknown is not only justified—it provides further support for her claim. *Cf. Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1505 (M.D. Fla. 1995) (Plaintiffs' "after-the-fact knowledge" of a colleague's "peeping and videotaping scheme" supported their hostile work environment claims where "[a]dditional and new holes were discovered after [the perpetrator's] arrest and termination, and the Plaintiffs continued to be concerned about the security of their dressing areas").

Finally, there is no serious dispute that Abbt was profoundly injured as a result of her changed working conditions. She was understandably "humiliated, disgusted, and upset" by her discovery of what her superiors had done. The city's own therapist diagnosed her with post-traumatic stress disorder. And she subsequently left the Department for medical reasons.

So there is ample evidence here for a jury to determine that Abbt subjectively found her work environment sufficiently "hostile or abusive" to have "actually altered the conditions of [her] employment." *Harris*, 510 U.S. at 21–22. And there is likewise ample evidence for a jury to find that an objectively reasonable person would agree with Abbt. *See*, *e.g.*, *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (Title VII's "dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended")

18

(quotations omitted); *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874 (5th Cir. 1999) ("To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so.").

In sum, I agree that the district court erred in granting summary judgment on Abbt's hostile work environment claim. I accordingly concur.