# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 8, 2024

Lyle W. Cayce
Clerk

_____

No. 22-30699

_____

Carolyn Johnson,

*Plaintiff—Appellant*,

*versus*

Board of Supervisors of Louisiana State University and
Agricultural and Mechanical College,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-12823

_____

Before Smith, Southwick, and Higginson, *Circuit Judges*.
Stephen A Higginson, *Circuit Judge*:

Plaintiff-Appellant Carolyn Johnson ("Johnson") appeals summary judgment on her claims of Title VII harassment and retaliation against former employer Defendant-Appellee LSU Health Sciences Center ("LSUHSC"). For the reasons that follow, we AFFIRM.

I.

Johnson is an African-American female who worked at LSUHSC as an Administrative Coordinator in the Division of Animal Care. Her

No. 22-30699

responsibilities included performing administrative duties for the veterinarians at LSUHSC. To facilitate this, Johnson's desk was located in an open area which connected to the offices of certain veterinarians, including Dr. Jeffrey Schumacher ("Schumacher").

On Friday, August 10, 2018, Schumacher slapped Johnson on her buttocks ("the Incident"). According to Johnson, this was predated by many acts of sexual and racial harassment in the preceding months (together, "pre-Incident conduct"), during which Schumacher: (i) referred to her as "Boo"; (ii) looked down her blouse three or four times; (iii) talked about sex with African-American women with a coworker in Johnson's presence, including making a remark that "black women have big asses"; (iv) made daily comments about Johnson's appearance and perfume; and (v) suggested "getting together about five times."

On Tuesday, August 14, Johnson emailed her direct supervisor, Shantell Curtis,[1] to express that she needed to talk. Curtis called and Johnson told her what happened, and Curtis sent an e-mail to human resources ("HR") about the Incident. Two days later, on August 16, Johnson called Curtis to see if there was any response. After Curtis told her that no one from HR had responded to the email, the two went and spoke with Jason Johnson ("Jason"), an employee in HR. Jason explained that because Schumacher was faculty and Johnson was staff, he had to wait for Vice-Chancellor Moerchbacher to return from vacation to handle the complaint.

Following the conversation with Jason, Johnson was temporarily relocated. First, she was moved to a space near Curtis, which was located in

---

[1] The record inconsistently identifies Curtis' first name (sometimes spelling it "Shantell," and sometimes spelling it "Chantell"), but this opinion adopts "Shantell," the spelling taken from Curtis' deposition.

another building, separate from the faculty for whom Johnson worked, from August 20 through August 24. Then on August 27, she was moved back to a storage room in Animal Care, which was located around the corner from Johnson's original workstation. Johnson testified that the storage room to which she was relocated was full of gnats, emitted an odor, and had windows that were covered with black paper. Johnson complained about the bug problem, and Curtis responded by buying "at least six or seven different kinds of bug sprays," but Johnson was not relocated.

Upon Moerchbacher's return on August 27, LSUHSC initiated an investigation, which concluded on September 18 and ultimately substantiated Johnson's complaint. Johnson was informed that she could return to her original workspace and Schumacher would be moved.

On September 25, 2019, Johnson sued LSUHSC. After some of her claims were dismissed, she filed an amended complaint alleging sexual harassment, racial discrimination, and retaliatory harassment in violation of Title VII based on pre-Incident conduct, the Incident, and Johnson's relocation to the storage room. The district court granted LSUHSC's motion for summary judgment as to all three claims, and Johnson appealed.

II.

A summary judgment is reviewed *de novo*, applying the same standards as the district court. *EEOC v. Agro Distr., LLC*, 555 F.3d 462, 469 (5th Cir. 2009). Summary judgment is proper when the moving party can demonstrate that, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 840-41 (5th Cir. 2013). "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rogers v.*

No. 22-30699

*Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In opposing summary judgment, a party "may not rest on mere conclusory allegations or denials in its pleadings." *Smith v. Regional Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)). A panel "may 'affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court.'" *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 928 (5th Cir. 2010)).

## III.

Johnson brings claims for racial and sexual harassment, as well as retaliation, pursuant to Title VII.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against discrimination extends to protect against either "a tangible employment action, such as a demotion or denial of promotion, or . . . a hostile or abusive working environment." *Lauderdale v. Tex. Dep't of Crim. Just.,* 512 F.3d 157, 162 (5th Cir. 2007); *see also Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011) (noting that "[t]he phrase 'terms, conditions, or privileges of employment' includes requiring people to work in a discriminatorily hostile or abusive environment" (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))). Johnson does not allege that any of the conduct constituted or resulted in a tangible employment action, such as a firing or a demotion. Thus, to establish that she was sexually or racially harassed in violation of Title VII, Johnson must show "that the

4

harassment created a hostile or abusive working environment." *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434 (5th Cir. 2005). To make this showing, Johnson must demonstrate that:

> (1) she is a member of a protected group; (2) she was the victim of uninvited sexual [or racial] harassment; (3) the harassment was based on sex [or race] (4) the harassment affected a "term, condition, or privilege" of [her] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

*Id.*; *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012).

Title VII also prevents retaliation by "forbid[ding] employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)).

We first consider Johnson's harassment claims related to the Incident, before turning to her harassment claims related to the pre-Incident conduct, and then to her retaliation claim related to her temporary relocation to the storage room.

## A.

With respect to her Title VII harassment claims regarding the Incident, Johnson has failed to make the requisite showing on the fifth element: that LSUHSC "knew or should have known of the harassment and failed to take prompt remedial action." *Harvill*, 433 F.3d at 434.

No. 22-30699

To constitute "prompt remedial action" by an employer, the remedial action "must be reasonably calculated to end the harassment." *Stewart v. Miss. Transp. Comm'n.*, 586 F.3d 321, 329 (5th Cir. 2009). This is "a fact-specific inquiry," as "not every response by an employer will be sufficient to absolve the employer of liability under Title VII." *Williams-Boldware v. Denton County*, 741 F.3d 635, 640 (5th Cir. 2014) (internal quotation marks and citation omitted). Nonetheless, "[i]n certain circumstances, we have held that an employer took prompt remedial action as a matter of law." *Id.* (internal quotation marks and citation omitted). We have so held, for instance, where immediately after the reported harassment, the manager separated the plaintiff and harasser and instructed the harasser to stay away. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999); *see also Kreamer v. Henry's Towing*, 150 F. App'x 378, 382-83 (5th Cir. 2005) (per curiam) (finding a prompt response where the employer issued a series of warnings and, after those warnings proved ineffective and the harassment sporadically continued and escalated over the course of six days, transferred offender away from the plaintiff).

Here, after Johnson lodged her complaint with HR (on a Thursday), LSUHSC promptly took steps so that Johnson did not have to interact with Schumacher, including relocating her workspace that following Monday.[2]

---

[2] Johnson alleges that she would run into Schumacher and was told that she would have to work with him during the pendency of the investigation. But there is no evidence of this in the record other than the allegations in her pleadings, which cannot be credited to defeat summary judgment. *See Smith*, 827 F.3d at 417; *see also* Fed. R. Civ. P. 56(c)(1) (requiring factual positions in summary judgment to be supported by citations to "materials in the record," including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials").

LSUHSC also opened an investigation, which eventually substantiated Johnson's claims and led to permanently moving Schumacher.

Though it is true that the official investigation was not commenced until August 27,[3] eleven days after Johnson's report to HR on August 16, this does not demonstrate that LSUHSC's response was unreasonably calculated to end the harassment. Unlike *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298 (6th Cir. 2016), which Johnson invokes in support of her argument, it cannot be said that LSUHSC exhibited "total inaction for ten days," *id.* at 312. Indeed, unlike in *Smith*, LSUHSC did not have a history of complaints and disciplinary action against Schumacher, *compare id.* at 305; *did* immediately separate Johnson and Schumacher, *compare id.* at 304, 312, and *did* conduct an investigation that was not alleged to be deficient, *compare id.* at 311.

Here, LSUHSC quickly took action to separate Johnson and Schumacher in order to prevent potential further harassment.[4] LSUHSC's actions were very similar to those undertaken in other cases where this court has found prompt remedial action as a matter of law: Johnson and Schumacher were physically separated, and Schumacher was instructed not to have contact with or be around Johnson. *See Skidmore*, 188 F.3d at 616. Because Johnson has failed to demonstrate the fifth element, her harassment claims relating to the Incident fail.

B.

---

[3] To the extent the district court suggested that the investigation began on August 16, it erred.

[4] Johnson also alleges that because she ran into Schumacher, she became so afraid that, rather than leave the storage room to go to the bathroom, she urinated on herself two to three times. This is, however, only alleged in the complaint and not supported by evidence that might properly defeat summary judgment.

No. 22-30699

Johnson's pre-Incident conduct claims also fail at the fifth element, as she fails to identify a genuine issue of fact showing that LSUHSC either "knew or should have known of the harassment." *Harvill*, 433 F.3d at 434. For this analysis, "it matters whether a harasser is a 'supervisor' or simply a coworker." *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 839 (5th Cir. 2015) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).[5] That is because "[a]n employer can be put on notice of harassment, and therefore be required to take remedial action, [only] if a person within the organization who has the 'authority to address the harassment problem' or an 'affirmative duty' to report harassment learns of the harassment in question." *Abbt v. City of Houston*, 28 F.4th 601, 607 (5th Cir. 2022) (quoting *Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir. 1998)). "[T]he key to whose knowledge may be imputed to the employer is remedial power: There is no actual knowledge until someone 'with authority to address the problem' is notified." *Sharp v. City of Houston*, 164 F.3d 923, 929–30 (5th Cir. 1999) (citation omitted).

When the harasser is a co-worker, "the negligence standard governs employer liability," and employers are only negligent if they "knew or should have known about the conduct and failed to stop it." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 229–30 (5th Cir. 2023) (citations omitted). "It weighs against finding negligence if the affected employee 'unreasonably fail[s] to take advantage of corrective opportunities provided by' the employer." *Id.* (citation omitted).

(i)

---

[5] A supervisor is defined as an employee "empowered . . . to take tangible employment actions against the victim." *Matherne*, 624 F. App'x at 839 (quoting *Vance*, 570 U.S. at 424).

As a threshold issue, Johnson alleged various facts in an affidavit submitted in support of her opposition to the motion for summary judgment, which LSUHSC moved to strike on the grounds that it failed to meet the requirements of Federal Rule of Civil Procedure 56(c)(4) and contained inadmissible evidence, including statements for which Johnson lacked personal knowledge. Assuming without deciding that the affidavit statements were admissible, the district court nonetheless granted summary judgment because it found that none of the testimony in the affidavit created a genuine issue for trial. In particular, the district court found that Johnson's statements as to "what other individuals saw, heard, thought, and did in relation to Dr. Schumacher's alleged conduct before the Incident" were conclusory and failed to present a genuine issue "'in the face of conflicting and probative evidence' in the record," including Johnson's own prior deposition testimony and the absence of any witness deposition testimony recalling the conduct Johnson alleged.

While we disagree that Johnson's affidavit testimony was conclusory, we do agree that certain conflicting statements contained therein may be properly disregarded under the sham-affidavit exception. Under that doctrine, a party cannot "defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (internal quotation marks and citation omitted). The "bar for applying the doctrine," however, "is a high one," and "typically require[s] affidavit testimony that is inherently inconsistent with prior testimony." *Id.* (internal quotation marks and citation omitted); *see also Winzer v. Kaufman County*, 916 F.3d 464, 472 (5th Cir. 2019) (noting that a district court may refuse to consider statements in an affidavit only where they are "so markedly inconsistent with a prior statement as to constitute an obvious sham" (internal quotation marks and citation omitted)). Importantly, this inconsistency must be with the *affiant's* own

prior testimony, not the testimony of others. *See Seigler*, 30 F.4th at 477 ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting *his own prior testimony*, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (emphasis added).[6]

(ii)

In light of the above, we evaluate testimony as to each individual to whom Johnson claims she reported Schumacher's pre-Incident conduct—Curtis, Johnson, and Birke—to determine whether it supports a genuine issue of fact that LSUHSC either "knew or should have known of the harassment."

First, Johnson's affidavit states that she had had conversations with Curtis, her direct supervisor, on multiple occasions regarding Schumacher's pre-Incident conduct. This is, however, contradicted by Johnson's own unambiguous deposition testimony that she never reported Schumacher's pre-Incident conduct to Curtis or HR, which Johnson herself concedes on appeal. As a result, Johnson's affidavit testimony does appear to be "so markedly inconsistent with [her] prior deposition as to constitute an obvious sham," *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988), and the district court did not abuse its discretion in refusing to consider it as evidence.

---

[6] To the extent that the district court disregarded Johnson's affidavit on the ground that it was contradicted by *other* witness testimony, such as because "[t]he record shows that no witness deposed in this case recalled the conduct Plaintiff now alleges," this was likely an abuse of discretion. Such contradictions may negatively impact Johnson's credibility, but credibility is a determination for the jury, not the court. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 162 ("How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage.").

Next, Johnson argues there is a triable issue due to the allegation in her affidavit that Jason from HR had seen a photo—where Johnson's face and torso were put on top of a photo of a football player who was wearing "skin-tight football pants"—posted near Schumacher's office, and merely laughed it off rather than addressing it. But as discussed above, Johnson agreed when asked at her deposition whether it was accurate that she did not report "any of . . . [the] inappropriate [pre-Incident] behavior" to HR, which would have necessarily included Jason. The breadth of Johnson's deposition testimony therefore tends to contradict the allegation contained in the affidavit.

Johnson also argues that LSUHSC should have known about Schumacher's pre-Incident conduct, as there were "warning signals" from a previous episode in which Schumacher was reported by an intern for initiating a conversation in which he, among other things, "asked whether she was in a relationship" and "described the sexual preferences of his family members." The intern testified that she immediately reported the conversation and was promptly moved to the library (away from Schumacher), where she remained for the rest of her internship. While this evidence suggests that LSUHSC had general knowledge of one instance in which Schumacher had behaved inappropriately prior to the Incident, it does not suggest that LSUHSC was on notice that Schumacher might engage in the type of behavior that Johnson alleges, nor does it imply that LSUHSC knew of Schumacher's pre-Incident conduct towards Johnson. Based on the available deposition testimony from the intern, moreover, it appears that LSUHSC took quick action to remedy the situation—by moving the intern away from Schumacher, as it did with Johnson—and Johnson makes no allegation that any problems persisted. This evidence, then, is insufficient to impute knowledge to LSUHSC.

Finally, Johnson argues that another veterinarian, Dr. Leslie Birke, was aware of, and was even attempting to address, Schumacher's

harassment. Johnson stated that she had had multiple conversations with Birke about Schumacher's inappropriate conversations, which Birke personally witnessed and even attempted to stop. Because Johnson identifies Birke as the "Acting Director of Animal Care," she argues that those allegations are sufficient to demonstrate that LSUHSC knew about Schumacher's pre-Incident harassment.

It is a close question as to whether Johnson has presented sufficient evidence to create a factual dispute as to whether Birke was a supervisor with either "'authority to address the harassment problem' or an 'affirmative duty' to report harassment learns of the harassment in question." *Abbt*, 28 F.4th at 607. It is true that Birke had the title of Acting Director of Animal Care; and at oral argument, Johnson pressed this title. Reliance on that mere title alone, however, is insufficient to carry Johnson's burden of establishing the elements of her claim at the summary judgment stage. Johnson provides no evidence, organization chart or otherwise, to support her allegations about Birke's position relative to hers. Evidence in the record actually indicates that Johnson had a different employee classification than the veterinarians with whom she worked, and had different supervisory structures (as noted earlier, Jason had explained to Johnson "that because she was staff and Dr. Schumacher was faculty he could not open up an investigation until he consulted with Vice-Chancellor Moerchbacher"). Indeed Birke, like Schumacher, was a veterinarian in the Animal Care division—and Johnson concedes that Schumacher was not her supervisor.

There is deposition testimony in which Birke is asked "did you ever instruct Dr. Schumacher to avoid and stay away from Ms. Johnson?", to which Birke says "yes." Inferring from this exchange that Birke had disciplinary authority over Schumacher, however, would be an inference predicated on multiple assumptions, and seemingly contradicted by Johnson's own suggestion that Schumacher would speak to Birke in a derogatory manner and

No. 22-30699

that Birke's alleged attempts to stop Schumacher's behavior were ineffective. Moreover, such an inference is an argument that Johnson herself does not make. On balance, therefore, it has not been shown either that Birke, as faculty, would have had supervisory authority over Johnson, who was staff; or that Birke had disciplinary authority over Schumacher. We thus agree with the district court that there is insufficient evidence in the record upon which to impute knowledge of Schumacher's pre-Incident events to LSUHSC.

## C.

Johnson's third claim is that LSUHSC retaliated against her for reporting Schumacher's harassment by moving her to the storage room while the investigation was ongoing.

Although in her brief and at oral argument Johnson argues she has direct evidence of retaliatory intent from Curtis' alleged statements, these are only found in Johnson's complaint, and a party opposing a properly-supported summary judgment motion "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57 (1986)). "Where, as here, the plaintiff seeks to prove causation by circumstantial evidence, she carries the initial burden of establishing a prima facie case of retaliation, and the retaliation claim is analyzed under a *McDonnell Douglas* burden-shifting framework." *Saketkoo*, 31 F.4th at 1000 (citations and internal punctuation omitted).

Under that framework, the employee must show that "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Id.* (internal quotation marks and citation

omitted). Upon that successful showing, the burden shifts to the employer to "provide 'a legitimate, non-discriminatory reason' for the adverse employment action." *Id.* (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020). The employee can then attack any proffered reason as pretextual. *Id.*

As the Supreme Court has expressed, an adverse action for the purposes of Title VII retaliation need only be one that a reasonable employee would have found "materially adverse," meaning "it . . . might have dissuaded a reasonable worker from making or supporting [protected activity]." *Burlington*, 548 U.S. at 68. As such, the district court erred when it required Johnson to show that she suffered an "adverse employment action" "consist[ing] of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating."[7] Johnson was not, therefore, required to show a specific adverse employment action to establish her retaliation claim.

Under the proper standard for Title VII retaliation—whether reasonable employees would have been dissuaded from protected activity—the parties dispute whether Johnson has established a prima facie case. We need not decide this issue. Even if we assume Johnson meets her burden in establishing that prima facie case, it is clear that Johnson fails under the third step of the *McDonnell Douglas* burden-shifting framework: LSUHSC provided a

---

[7] This is, moreover, a standard that our court has recently summarily repudiated. *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 497 (5th Cir. 2023) (en banc) ("Despite [Title VII's] broad language, we have long limited the universe of actionable adverse employment actions to so-called 'ultimate employment decisions.' We end that interpretive incongruity today. . . . [W]e hold that a plaintiff plausibly alleges a disparate-treatment claim under Title VII if she pleads discrimination in hiring, firing, compensation, or the 'terms, conditions, or privileges' of her employment. She need not also show an 'ultimate employment decision,' a phrase that appears nowhere in the statute and that thwarts legitimate claims of workplace bias.").

legitimate, non-retaliatory reason for Johnson's relocation to the storage room, and Johnson advances no evidence of pretext to create a genuine dispute on the issue.

Deposition testimony indicates the intention behind the relocation was to separate Johnson from Schumacher during the investigation. LSU-HSC believed it would be a "safe place" where she would not run into Schumacher, and there was limited space. Johnson responds that LSUHSC should have found her another room, and that "[i]f LSU[HSC] could transfer her remotely once, LSU[HSC] could have done it again." Speculation that she could have been assigned another room, however, does not demonstrate that LSUHSC's reasons for assigning Johnson to the storage room were pretextual. It is unclear what other rooms existed—Johnson does not provide any evidence to suggest those did exist—and Birke testified that there was limited space. Indeed, Johnson herself acknowledges that Curtis and HR thought she needed to be close to the faculty in Animal Services, as the storage room was. Therefore, Johnson has failed to marshal evidence to demonstrate that LSUHSC did not relocate her to the storage room for legitimate, non-retaliatory ends, and her claim for retaliation fails.

## IV.

Because the record does not contain evidence to demonstrate a genuine factual dispute as to whether LSUHSC took prompt remedial action to address Johnson's complaint about the Incident or LSUHSC's knowledge of Schumacher's pre-Incident behavior, we AFFIRM summary judgment on Johnson's harassment claims. Similarly, because Johnson fails to create a genuine dispute of fact that LSUHSC's reasons for relocating her to the storage room were pretextual, we also AFFIRM summary judgment on Johnson's retaliation claim.