Filed 5/23/25

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| LILLIAN CARRANZA, | B327196 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19STCV02594) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment and an order after judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge. Affirmed.

Lozano Smith, Mark K. Kitabayashi, Mark W. Waterman, and Fabiola M. Rivera for Defendant and Appellant.

Law Offices of Gregory W. Smith, Gregory W. Smith, Diana Wang Wells; Bendon & Serlin, Douglas G. Benedon and Judith E. Posner for Plaintiff and Respondent.

_____

* Under California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication except for Discussion sections B and C.

Lilian Carranza, a captain in the Los Angeles Police Department (LAPD or Department), learned that a photo of a topless woman falsely said to be her was circulating electronically among LAPD personnel. One of her subordinates told her he had seen on-duty officers looking at the photo on a cellphone and making lewd comments about Carranza, and he told her everywhere he went officers were talking about the photo. Carranza asked the Department to notify its employees that the photo was not of her, and to order they stop sharing it. The Department declined to do so. Its own investigation later confirmed that the photo, intended to depict Carranza, was distributed throughout the Department.

Carranza sued the City of Los Angeles, asserting a single cause of action for hostile work environment due to sexual harassment under the Fair Employment and Housing Act (FEHA). A jury found in Carranza's favor, determining she experienced severe or pervasive harassment and that the LAPD failed to take immediate and appropriate corrective action despite knowing of the conduct. It awarded her $4 million in noneconomic damages.

In the published part of the opinion we address the City's contention that Carranza did not experience harassment directly and the conduct was not so severe or pervasive as to alter the conditions of her job. We conclude substantial evidence supported the jury's determination that Carranza endured severe or pervasive harassment that altered the conditions of her workplace, based on her secondhand knowledge that the photo was widely circulating around the Department.

In the unpublished portion of the opinion we address the

City's contentions that the trial court abused its discretion (1) in denying the City's motion for a new trial based on alleged juror misconduct during deliberations, and (2) in setting the hourly rates and lodestar multiplier used to calculate Carranza's attorney fee award. We find no abuse of discretion in either regard, and affirm both the judgment and the attorney fee award.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Carranza Learns of a Nude Look-alike Photo and Submits a Complaint to the City*

In November 2018, Carranza held the rank of "Captain III"— placing her among the top 115 sworn LAPD officers and the top one percent of the Department's 13,000 employees. She led the Commercial Crimes Division, overseeing about 100 employees stationed across the city of Los Angeles.

In mid-November 2018 while on vacation in Hawaii, Carranza received a call from her attorney, Gregory Smith. Smith told her a nude photo resembling her "was circulating" within the LAPD and sent her a copy. The photo depicted a closeup of the naked upper torso of a woman pursing her lips with her breasts prominently displayed. Though the woman was not Carranza, she had similar facial features. When Carranza received the call from Smith, she was "very hurt [and] confused" and "[f]elt betrayed, devalued, [and] objectified."

Carranza immediately lodged a complaint with MyVoiceLA, an independent City agency that fields sexual harassment complaints from employees, including LAPD officers. She cut short her vacation and flew home.

3

B.　*The LAPD Opens Its Investigation and Interviews Carranza*

A little over two weeks after Carranza submitted her complaint to MyVoiceLA, the LAPD's internal affairs department assigned investigator Tracey Gray to the case. Once Gray received a copy of the photo from Smith, she attempted to obtain its metadata,[1] but the LAPD's information technology division advised her that identifying metadata required access to the device from which the photo originated.

Gray interviewed Carranza in mid-December with Smith present. When Gray asked where Carranza obtained the photo, Smith said it had come from one of his clients, whose identity he would not reveal due to attorney-client privilege. (Smith had an attorney-client relationship with all members of the association for LAPD commanding officers because he provided legal representation to that organization.)

Carranza confirmed the woman in the photo was not her but said the woman had similar features — especially the eyes. Carranza did not identify any LAPD employees who possessed the photo or describe any interactions she had with LAPD employees regarding the image.

Carranza told Gray she believed the photo was being shared within the LAPD and wanted it to stop. She asked that the LAPD find the source of the photo and send a message that distributing it was misconduct. Specifically, Carranza requested that LAPD Chief Michael Moore issue a notice that sharing the photo was inappropriate.

Gray responded that she would try to facilitate Carranza's

---

[1]　Metadata is information such as the date, time, and location of a photo, and whether it was sent from one phone to another.

4

request. She forwarded the request up the chain of command, including to Deputy Chief Debra McCarthy, who led internal affairs and reported directly to Moore. Gray testified that her investigation primarily focused on discovering who originally circulated the photo, not identifying those who later possessed it.

C.  *A Detective Reports Officers Are Sharing the Photo, and Carranza Alerts the LAPD*

On December 22, 2018, after Carranza had her initial interview with Gray, Detective Armando Munoz called Carranza. Munoz was assigned to the Commercial Crimes Division under Carranza's command. His assignment took him to different LAPD stations around Los Angeles.

Carranza testified that Munoz informed her there was "a naked picture of [her] being distributed throughout the city." Munoz testified he told her that in late November he had walked past three uniformed officers — including a supervisor — standing in a hallway at Mission Station in Mission Hills. He heard one of them say Carranza's name, which caught his attention. The officers were looking at a nude photo that Munoz believed depicted Carranza. He overheard them making comments about her body, "basically saying, you know, 'Look at her tits. Oh, look it. I knew she was like this.' "

Carranza told Munoz the woman in the photo was not her, and asked him where the photo was being circulated. Munoz replied, " 'I have heard people talking about it, you know, everywhere I go.' " Munoz testified the photo "was a hot subject at the time."

Munoz could hear from Carranza's voice that she was upset. Carranza testified that at this time she believed there

5

were "dozens, if not hundreds" of officers passing the photo around. She felt sad and "desperate" because she believed LAPD was taking no action to stop the continuing distribution of the photo.

The same day Munoz called her, Carranza emailed McCarthy and wrote that the photo was "reportedly being shared by on duty personnel making derogatory comments." She added: "I am reaching out to you as the top official in charge of Professional Standards Bureau. During the interview the investigator appeared confused as to how to proceed with the investigation." Carranza also copied Chief of Staff Robert Green.

The same day, McCarthy responded that there was an "an ongoing personnel complaint" and assured Carranza the matter was "being taken quite seriously." McCarthy followed up with another email, copying Munoz, Green, and another internal affairs employee, asking Carranza to identify the officers involved and explaining it would help to interview them. The next day, on December 23, Carranza replied: "I would request that corrective action be taken immediately informing members of the Department that the picture I'm referring to is not me and that distributing such photos is misconduct and could be a criminal offense. Simply investigating does not stop the action of 100s, if not 1000s, of employees. I would also like to review the email before it is sent." McCarthy responded the next day, again stating the investigation was being taken seriously, and wishing Carranza a Merry Christmas. Two months later, in February 2019, McCarthy forwarded Carranza's emails to Gray.

On December 24, Carranza was at home feeling "extremely sad" and "very upset about the lack of action by the Department or seemingly to take my personal complaint seriously." She

experienced shortness of breath, palpitations, pain in her left arm, and high blood pressure. She went to the Simi Valley emergency room and was hospitalized overnight. She was released on Christmas Day.

Around the same time, McCarthy informed Moore that Carranza had requested he issue a Department-wide communication clarifying that the woman in the photo was not her and warning that distributing the image constituted misconduct. Moore testified he believed the photo was intended to "harass, intimidate, . . . [and] slander" Carranza, and "to cause ridicule or embarrassment or harassment of her," and that sharing the photo amounted to misconduct. Moore and McCarthy discussed the pros and cons of sending the communication to LAPD employees that Carranza was requesting. The benefit, Moore said, would be to "appease" Carranza. But he had greater concerns that it would cause "further embarrassment" or questions "by an organization of some 13,000 people that would say 'what photograph are we talking about and how can we find it.' " He also worried sending a communication could disrupt the pending investigation. In the end, Moore chose not to issue the message. No one ever informed Carranza of Moore's decision or his reasoning.

D.    *Additional Incidents*

In mid-November 2018 a group of uniformed officers from various divisions were working an overtime shift at the Staples Center. One officer received the photo on his phone and shared it with the others. The officers believed the woman in the photo was Carranza, and one took a picture of it with his phone. Gray learned of the Staples Center incident when one of the officers

who was present at the incident gave the photo to a third party, who alerted the LAPD. Gray later identified some of the officers involved and interviewed them but could not determine the source of the photo in part because one officer refused to turn over his personal phone.

Between late 2018 and February 2019 Lieutenant Amira Eppolito, the watch commander at the Topanga Community Station, saw a group of officers gathered around a phone. From several feet away, Eppolito "s[aw] a glimpse" of the photo, which she believed was Carranza, for "a few seconds." The officers had a joking demeanor. Eppolito testified she did not know the officers involved and could not remember if anyone said Carranza's name.

Eppolito also testified "there was a lot of discussion" about Carranza and the photo at the Department, and the photo continued to be a subject of discussion up to the time of trial. As watch commander, Eppolito oversaw around 75 officers and sergeants assigned to a patrol shift. Shortly after she saw officers looking at the photo, Eppolito felt "compelled to address personnel" because she "was upset and felt like [she] needed to do something about it." Eppolito asked about 30 officers and two or three sergeants how many of them had seen "compromising" photos of "Department women." More than half raised their hands. Eppolito told the officers the behavior was an inappropriate way to treat "your sister in blue."

Eppolito reported the incident she had witnessed to Moore's adjutant, whom Eppolito described as Moore's "No. 1 staff person" and his "confidant," and she urged that Moore should conduct a video roll call about the photo. Moore's adjutant told her there was a meeting to discuss the photo, but Eppolito never

heard of any follow-up action.

At trial Carranza was not permitted to introduce evidence that she learned of the incidents at the Staples Center or the Topanga Community Station. The court granted the City's motion in limine and precluded her from "relating . . . conversation[s] in which she was told that a picture of her had been circulated" for "lack of foundation, lack of relevance, likelihood of confusing the issues and misleading the jury, and hearsay." Carranza later submitted a trial brief arguing such statements would be admissible as non-hearsay (for the effect on the listener) and were relevant to prove Carranza's subjective reaction was reasonable, but the court again ruled the evidence was inadmissible. Thus, with respect to Carranza's knowledge of specific incidents, the jury received evidence only of Carranza's initial phone call from Smith and her subsequent conversation with Munoz following the incident at the Mission Station.

Carranza testified no one ever directly joked about the photo to her, directly harassed her, or made derogatory comments to her.

E. *Carranza Sues the City*

On January 25, 2019, Carranza filed suit against the City, asserting one cause of action for sexual harassment based on a hostile work environment.

F. *The LAPD's Investigation Results*

By August 2019 the LAPD completed its internal investigation. A "Commanding Officer's Adjudication" sustained Carranza's allegation that "an unknown Department employee, while on or off-duty, circulated a photograph of a nude woman

9

throughout the Department and indicated it was Carranza in the photograph." The investigation identified 10 to 13 people who saw the photo and four separate incidents of people viewing or hearing about the photo in November 2018. Besides the incidents at the Staples Center and the Mission Station, the report indicated an officer working at the Metropolitan Transportation Authority heard about the nude photograph being circulated, and another officer heard a rumor about the Carranza photograph being circulated and then received the photograph on his personal cellphone. This same officer later heard employees discussing the photograph at Central Division. The adjudication report did not include the incident at the Topanga Community Station or discuss any incidents after November 2018.

The adjudication found that "[t]he fact that the photograph . . . had been received and discussed as being Carranza in least at four different locations at different times supports beyond a preponderance that the photograph was circulated throughout the Department and that the photograph was portrayed to various officers as an image of Carranza." It concluded that sharing the image violated both the City's and the LAPD's sexual harassment policies, which prohibit sexual harassment, discriminatory conduct, and the dissemination of gender-based derogatory images, and require all LAPD personnel to report harassment they witness. The adjudication deemed the conduct "serious misconduct." However, the LAPD did not discipline any employees, stating it was unable to identify who was responsible for the distribution of the photo.

In September or October 2019 Carranza received a letter from the LAPD, on behalf of Moore, stating her allegations had been sustained. The letter said appropriate penalties would be

10

imposed but did not disclose further details, citing confidentiality reasons.  Carranza later learned no officers were disciplined.

G.     *The Trial*

The jury trial began in September 2022 and lasted seven days.  Gray, McCarthy, Moore, Eppolito, and Munoz testified as witnesses.  In addition, there were two medical expert witnesses and an expert witness on communication within law enforcement agencies.

Carranza introduced evidence that after the incidents involving the photo she was diagnosed with major depressive disorder, generalized anxiety disorder, psychological factors affecting physical health, and a panic disorder.  She experienced suicidal ideation, panic attacks, and physical symptoms like hypertension.  Her doctor increased her blood pressure medication and prescribed psychiatric medication.  Carranza presented expert testimony that she would continue to need regular treatment for at least six more years.

Since learning about the photo, Carranza had felt uncomfortable at work and had difficulty concentrating.  She described interactions where officers stopped talking and looked at their phones when she approached, prompting her to wonder if they were looking at the photo.  When she got into elevators, male officers looked her up and down and grinned.  She felt ashamed, avoided public settings, and was no longer comfortable speaking to the public and the press — tasks that were part of her job.  She believed her personal and professional reputations had been harmed.

The jury returned a special verdict for Carranza the day after deliberations began.  Specifically, it found (1) Carranza was

11

harassed because she is a woman; (2) the harassment was severe or pervasive; (3) a reasonable woman in her circumstances would have considered the environment to be hostile, intimidating, oppressive, or abusive; (4) Carranza considered the environment to be so; (5) the City knew or should have known of the harassing conduct; (6) the City failed to take immediate corrective action; (7) Carranza was harmed; and (8) the harassing conduct was a substantial factor in causing harm.  Ten jurors found the harassment severe or pervasive; two did not.

The jury awarded Carranza $1.5 million in past noneconomic damages and $2.5 million in future noneconomic damages, for a total of $4 million.  The trial court entered judgment against the City, and the City timely appealed.

H.    *The City's Pertinent Post-trial Motions*

The City moved for a new trial, arguing in relevant part that (1) there was insufficient evidence of severe or pervasive harassment because Carranza had not "endured sexually harassing interpersonal . . . interactions," and (2) jury misconduct had occurred during the deliberations.  The trial court denied the motion.

The court awarded Carranza $610,050 in attorney fees and $31,450 in expert witness fees, and the City timely appealed the fee award.

We consolidated the two appeals.

## DISCUSSION

A.    *Substantial Evidence Supports the Jury's Verdict That Carranza Was Subjected to a Hostile Work Environment*

    1.    *Standard of review*

When a party contends insufficient evidence supports a jury verdict, "[o]ur review '*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 37 (*Caldera*); see *Duncan v. Kihagi* (2021) 68 Cal.App.5th 519, 541.) " 'We must "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." ' " (*Duncan*, at p. 541.)  " 'Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury verdict.' " (*Casey N. v. County of Orange* (2022) 86 Cal.App.5th 1158, 1170-1171; accord, *Quintero v. Weinkauf* (2022) 77 Cal.App.5th 1, 5.)

Still, "substantial evidence" is not synonymous with "any" evidence.  (*People v. Bassett* (1968) 69 Cal.2d 122, 138-139; see *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 816.) To support the judgment, the evidence must be reasonable in nature, credible, and of solid value.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)  Moreover, " ' "a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork." ' " (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219.)

13

We review legal issues, including those involving statutory interpretation and the application of the law to undisputed facts, de novo.  (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912.)

2.  *Applicable law for workplace sexual harassment claims*

FEHA prohibits sexual harassment in the workplace.  (Gov. Code, § 12940, subd. (j)(1)[2] [it is unlawful "[f]or an employer . . . because of . . . sex . . . to harass an employee"]; see *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460, fn. 5 ["sexual harassment is a form of sexual discrimination"].)  " '[T]he prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex.' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).)  For a claim based on a hostile or abusive work environment, relevant here, the plaintiff "need not show evidence of unwanted sexual advances." (*Id*. at pp. 277-278.)  Besides unwanted sexual advances, "prohibited harassment includes 'verbal, physical, and visual harassment. . . .  [V]erbal harassment may include epithets, derogatory comments, or slurs on the basis of sex; . . . visual harassment may include derogatory posters, cartoons, or drawings on the basis of sex." (*Id*. at pp. 280-281; accord, *Taylor v. Nabors Drilling USA, LP* (2014)

---

[2]  Further undesignated statutory references are to the Government Code.

14

222 Cal.App.4th 1228, 1236.)

Sexual harassment in a workplace is imputable to an employer in two situations. " 'When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions.' " (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 635 (*Bailey*).) When the harasser is not the plaintiff's supervisor, an employer is liable " 'if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action.' " (*Ibid.*; see *Wawrzenski v. United Airlines, Inc.* (2024) 106 Cal.App.5th 663, 694 (*Wawrzenski*); § 12940, subd. (j)(1).)

To prevail on a hostile work environment claim under FEHA, a plaintiff must show "she was subjected to sexual advances, conduct, or comments that were (1) unwelcome [citation]; (2) because of sex [citation]; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." (*Lyle*, *supra*, 38 Cal.4th at p. 279; accord, *Wawrzenski*, *supra,* 106 Cal.App.5th at p. 692.) FEHA "harassment claims focus on 'situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.' " (*Bailey*, *supra*, 16 Cal.5th at p. 627; see *ibid.* ["harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace"].)

"The standard for workplace harassment claims strikes a 'middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.' " (*Bailey*, *supra*, 16 Cal.5th at p. 628.) " 'Conduct that is not severe or pervasive enough to create an

15

objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond [FEHA's] purview.' " (*Ibid.*) " 'But [FEHA] comes into play before the harassing conduct leads to a nervous breakdown' " and proscribes discriminatory conduct that " 'detract[s] from employees' job performance' " or " 'keep[s] them from advancing in their careers.' " (*Ibid.*)

Whether harassment is sufficiently severe or pervasive that it creates a hostile work environment is not a "mathematically precise test," but rather a fact-specific inquiry that turns on the totality of the circumstances. (*Bailey*, *supra*, 16 Cal.5th at p. 628; accord, § 12923, subd. (c) ["existence of a hostile work environment depends on the totality of the circumstances"]; see *Caldera*, *supra*, 25 Cal.App.5th at p. 38 [the determination of whether harassment is severe or pervasive " 'is ordinarily one of fact' "].) Relevant factors include " ' "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' " (*Bailey*, at p. 628.) " ' "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." ' [Citation.] ' "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" ' are not sufficient to create an actionable claim of harassment." (*Ibid.*) "The objective severity [or pervasiveness] of harassment should be judged from the perspective of a reasonable person in the plaintiff's position" (*id.* at p. 629), and requires consideration of the social context in which the behavior occurs and is experienced by its target (*Lyle*, *supra*, 38 Cal.4th at p. 283).

16

The City contends the "severe or pervasive" threshold is a "high standard" requiring "extreme" conduct and a "hellish" workplace. As we recently held, the "severe or pervasive" requirement was formerly " 'quite a high bar for plaintiffs to clear.' " (*Wawrzenski, supra,* 106 Cal.App.5th at p. 693.) In 2019, however, the Legislature added section 12923, which reaffirms a " ' "single incident of harassing conduct" ' " may constitute harassment " ' "if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive work environment." ' " (*Wawrzenski,* at p. 693.) It also " 'clarified that a hostile work environment exists "when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." ' " (*Ibid.*; accord, *Beltran v. Hard Rock Hotel Licensing, Inc.* (2023) 97 Cal.App.5th 865, 878 (*Beltran*).) " 'The plaintiff is not required to show a decline in productivity, only "that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to 'make it more difficult to do the job.' " ' " (*Wawrzenski,* at p. 693.) The City's proposed blanket requirement of a "high standard" of "extreme conduct" in all cases is not the law.[3]

---

[3] The City relies on several older cases discussing hostile work environment standards, including *Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336 and *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, disapproved of

### 3. *Carranza presented substantial evidence that the harassment was severe or pervasive*

On appeal, the City does not challenge the jury's findings that the challenged conduct was unwelcome, that it occurred because of Carranza's sex, and that the City failed to take immediate corrective action after learning that on-duty LAPD officers were viewing, electronically sharing, and joking with colleagues about the degrading photo of Carranza. Instead, the City contends only that there was insubstantial evidence that the harassment was sufficiently severe or pervasive to alter the conditions of Carranza's employment and create an abusive work environment. It argues she presented evidence about only one incident involving the photo at the Mission Station, which she did not witness or experience herself but merely learned about after the fact in a telephone call with Munoz.[4]

---

on other grounds by *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703. These cases are not useful because they do not take into account section 12923's definition of a hostile work environment. (See *Wawrzenski, supra,* 106 Cal.App.5th at p. 699 ["*Brennan . . .* is no longer good law"]; *Beltran, supra,* 97 Cal.App.5th at p. 880 [*Mokler* is "no longer good law when it comes to determining what conduct creates a hostile work environment in the context of a motion for summary judgment"].)

[4] We need not address the extent to which other incidents, such as the ones at the Staples Center and the Topanga Community Station, supported Carranza's claim. As discussed, at trial she was not permitted to introduce evidence regarding how and when she learned of them. The City argues these incidents "could not have impacted [Carranza's] perception of her work environment as she was not aware of them." Substantial evidence supported the jury's verdict without considering those additional specific incidents.

18

Substantial evidence supports the jury's finding that the harassment was sufficiently severe or pervasive to create a hostile work environment, i.e., that the harassing conduct sufficiently offended, humiliated, or distressed Carranza and that a reasonable person subjected to the same conduct would determine, as Carranza did, that the harassment so altered working conditions as to make it more difficult to do her job. (*Wawrzenski, supra*, 106 Cal.App.5th at p. 693; *Beltran, supra*, 97 Cal.App.5th at p. 878; § 12923, subd. (a).)  The photo in question was an embarrassing and degrading closeup of the naked breasts of a woman (intended to depict Carranza) in a sexual pose.  As the LAPD police chief acknowledged, the photo was meant to "harass, intimidate, . . . [and] slander" Carranza and "to cause ridicule or embarrassment or harassment of her."

Contrary to the City's contention, Carranza's claim was not based on a single incident in which a few fellow officers outside her unit viewed the photo, but instead was based on her reasonable understanding that the circulation continued for some length of time and involved "dozens if not hundreds" of officers, both identified and unknown, throughout the LAPD.

Carranza first learned about the photo when her attorney relayed that a nude photo resembling her "was circulating" around the LAPD.  Carranza understood not that the photo had been seen once or twice, but that it was being widely shared.  This was confirmed over a month later by Munoz, who told Carranza that officers were talking about the photo everywhere he went.  Indeed, LAPD's own investigation confirmed the widespread circulation of the photo within the Department; the Department sustained Carranza's allegation that "an unknown Department employee . . . circulated a photograph of a nude

19

woman throughout the Department and that the photograph was portrayed to various officers as an image of Carranza." Carranza learned that officers in her organization were gathering together to ogle at the topless photo, believing it was her, and joking while looking at it, making comments such as " 'Look at her tits. Oh, look it. I knew she was like this.' "

Compounding Carranza's distress was the fact that, despite her repeated requests, the Department did not order LAPD officers to stop sharing the photo, advise them that it was not Carranza in the photo, or discipline anyone involved in the distribution of the photo. That the LAPD allowed the distribution to continue unchecked not only speaks to the sufficiency of the LAPD's response to the harassment, but also to the pervasiveness and severity of the harassment itself and the impact on Carranza's work environment. (See *Schiano v. Quality Payroll Systems, Inc.* (2d Cir. 2006) 445 F.3d 597, 607, fn. 7 ["It seems reasonable to view unpunished misconduct as being more harmful or harassing than punished misconduct."].)[5] A reasonable jury could determine these circumstances amounted to severe or pervasive harassment.

Moreover, notwithstanding the City's suggestions to the contrary, Carranza presented substantial evidence that her work conditions were altered as a result of the harassment, making it more difficult for her to do her job. She testified that after first learning of the photograph's circulation from Smith, she "felt

---

[5]     "In interpreting [FEHA's] provisions, California courts often look for guidance in decisions construing . . . title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.," because of the similarities between the two schemes. (*Bailey, supra,* 16 Cal.5th at p. 626.)

dejected, very sad" and "didn't want to be in the presence of people at work." Carranza stated that in December 2018, she began having panic attacks for the first time and started therapy "[b]ecause [she] felt like [she] was in this dark hole and without any support." Carranza also canceled a vacation planned for mid-December because her blood pressure had "gone to levels that, according to [her] doctor, it was not safe for [her] to travel." She was "spiraling" and had to be hospitalized overnight on Christmas Eve. When she returned to work, male officers looked her up and down and grinned at her in elevators, and anytime she approached officers looking at their phones, she feared they were viewing the photo. She had trouble focusing and concentrating at work and felt ashamed, embarrassed, and uncomfortable in public settings. This interfered with her ability to perform her public-facing duties at work, which included press and community engagement.[6] Ample evidence was thus presented that the harassment affected her work performance. (See *Bailey*, *supra,* 16 Cal.5th at p. 448 [evidence that plaintiff was treated for severe anxiety and depression as a result of workplace stress, cried at psychiatrist's office on several

---

[6] The jury also reasonably could have determined the inherently disturbing effect of the workplace circulation of the look-alike topless photo was heightened given Carranza's position as a high-ranking female captain in the hierarchical organization of the LAPD, with such a high-visibility role. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Lyle*, *supra*, 38 Cal.4th at p. 283; see *id.* at p. 292 [noting "the importance of social context in which particular behavior occurs and is experienced"].)

occasions, and was visibly upset 10 months after one-time harassing incident could support a finding that harassment interfered with plaintiff's work performance].)

*Abbt v. City of Houston* (5th Cir. 2022) 28 F.4th 601 (*Abbt*) is instructive. Abbt, a female firefighter, learned that years earlier two of her fellow firefighters had stolen and repeatedly watched an intimate video showing her in the nude. The Fifth Circuit focused on the fact that Abbt "did not know, and still does not know, how far and wide the video had spread throughout the Fire Department. What she did know was that . . . [s]he would be returning to a work environment with no guarantees that copies of her intimate video were not still being shared amongst her coworkers. These possibilities stem directly from the harassment at issue, and subjectively affected Abbt's employment." (*Id.* at pp. 608-609.) The court reversed the district court's grant of summary judgment in favor of the city, holding that "a reasonable person could consider the repeated viewing of [Abbt's] intimate, nude video by her coworkers to be sufficiently severe to constitute sexual harassment," and that "the conduct was subjectively offensive to Abbt and affected a term or condition of her employment." (*Ibid.*; see also *Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at pp. 1234, 1246 [upholding verdict finding plaintiff was subjected to severe or pervasive sexual harassment in part based on supervisor's hanging a photo of plaintiff inside the employees' restroom with a target drawn around plaintiff's mouth along with a notation referencing oral sex].)

Similarly here, considering the totality of the circumstances, the jury reasonably could determine that Carranza's knowledge of the widespread circulation of a

sexualized nude image purporting to depict her, along with crude, objectifying commentary, "disrupt[ed] [Carranza's] emotional tranquility in the workplace, affect[ed] [her] ability to perform the job as usual, or otherwise interfere[d] with and undermine[d] [her] personal sense of well-being."  (§ 12923, subd. (a); see *Wawrzenski*, *supra*, 106 Cal.App.5th at p. 693.)

Contrary to the City's contention, FEHA does not require that Carranza have (1) had any direct interaction in which a coworker was disrespectful to her regarding the photo, (2) experienced direct "sexual hostility in her day-to-day work environment," or (3) been "assaulted, threatened, propositioned, subjected to physical contact, or subjected to explicit language in her presence."  The City seizes on language that " 'harassment refers to bias that is expressed or communicated *through interpersonal relations* in the workplace' " (*Bailey*, *supra*, 16 Cal.5th at p. 627, italics added; accord, *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686), and suggests Carranza had no such harassing interpersonal relations.  However, the photo and related comments were shared *among* LAPD employees, and others then informed Carranza about the circulation and the humiliating jokes at her expense.  That is a chain of interpersonal interactions that satisfies FEHA.

The City's position that a plaintiff must be harassed to her face is inconsistent with the long-standing principle that " 'a person can perceive, and be affected by, harassing conduct' in the relevant environment 'by knowledge of that harassment' as well as by "personal observation." ' "  (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 616, fn. 10; accord, *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 521; see *Abbt*, *supra*, 28 F.4th at p. 607 [plaintiff experienced harassment

even though coworkers watched her nude video outside her presence]; *Herrera v. Lufkin Industries, Inc.* (10th Cir. 2007) 474 F.3d 675, 681 ["It cannot be . . . that the fact that the harasser makes [harassing] references about the victim to others shields the harasser" from liability]; *Torres v. Pisano* (2d Cir. 1997) 116 F.3d 625, 633 ["The fact that many of [the harasser's] statements were not made in [the plaintiff's] presence is . . . of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile."]; *Lipsett v. Univ. of Puerto Rico* (1st Cir. 1988) 864 F.2d 881, 905 [sexually explicit drawing of female plaintiff's body posted in the men's facility at the hospital where she worked supported her hostile work environment claim]; *Ward v. Casual Restaurant Concepts Inc.* (M.D. Fla., Mar. 1, 2012, No. 8:10-CV-2640-EAK-TGW) 2012 WL 695846, at *5 [a reasonable jury could find harassment severe or pervasive where a restaurant host's manager took a nude picture of the host from her phone, showed it to other employees and a restaurant patron, and told other employees he was having a sexual relationship with her, none of which occurred in her presence].)

FEHA does not reward discretion in harassing behaviors. Rather, it protects victims from workplace environments poisoned by inappropriate conduct — whether "sung, shouted, or whispered."[7]  (*Sharp v. S&S Activewear, L.L.C.* (9th Cir. 2023)

---

[7]     Nor is there any basis in the law to require that Carranza had "contemporaneous" knowledge of the officers viewing, sharing, or discussing the photo.  (See *Abbt*, *supra*, 28 F.4th at p. 609 [lapse of time before plaintiff discovered co-workers had viewed her nude video did not necessarily mean she did not suffer harassment because "the pain the harassment caused is logically

69 F.4th 974, 981.) Substantial evidence supported the jury verdict finding the City liable for sexual harassment.

B.      *The Trial Court Properly Denied the Motion for a New Trial Based on Alleged Juror Misconduct*

The City contends juror misconduct occurred during the deliberations, asserting (1) the jury's damages award was not based on the evidence, and jurors improperly discussed the effect of attorney fees and taxes on the amount of damages Carranza would receive; (2) one of the jurors, Juror No. 3, demonstrated personal bias against the LAPD by claiming everyone in the LAPD must have seen the photo and referencing a "brotherhood" within the Department; and (3) during the deliberations jurors injected facts not deduced at trial, including a nurse who drew on her specialized training. The trial court properly denied the City's new trial motion asserting these grounds.

1.      *Applicable law and standard of review for claims of jury misconduct*

Under Code of Civil Procedure section 657, jury misconduct may justify a new trial. (Code Civ. Proc., § 657, subd. (1); see *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.) A trial court assessing a claim of juror misconduct

---

just as real . . . whether [plaintiff] learned of the actions immediately (by, say, walking in on a viewing), days later, or decades later"].)

Likewise, the City's reliance on cases involving claims based on harassing conduct outside the plaintiff's presence and directed at *third parties* is misplaced. (See, e.g., *Lyle, supra,* 38 Cal.4th at p. 289 [plaintiff barred from relying on offensive comments she was unaware of about *other women* to support *her own claim* for sexual harassment].)

must follow a three-step process: (1) determine whether the affidavits in support of the motion are admissible; (2) if admissible, determine whether the facts establish misconduct; and (3) assuming misconduct, determine whether the misconduct was prejudicial. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.) "Juror misconduct raises a presumption of prejudice, and unless the prevailing party rebuts the presumption by showing the misconduct was harmless, a new trial should be granted." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507.) But "[w]here the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Ibid.*)

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code § 1150, subd. (a).) Thus, evidence of jurors' "internal thought processes" and reasoning is inadmissible to impeach a verdict. (*In re Hamilton* (1999) 20 Cal.4th 273, 294; see Evid. Code § 1150, subd. (a); *Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 623.) But " '[j]uror declarations are admissible to the extent that they describe overt acts constituting jury misconduct.' " (*Harb*, at p. 623; see *In re Hamilton*, at p. 294.)

Evidence of a juror's statements "must be admitted with

26

caution," because "[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors." (*In re Stankewitz* (1985) 40 Cal.3d 391, 398.)  But statements made by jurors during deliberations are admissible when "the very making of the statement sought to be admitted would itself constitute misconduct."  (*Ibid.*; accord, *People v. Flores* (2021) 70 Cal.App.5th 100, 108.)  For example, "a statement of bias is misconduct."  (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 788.)

"An order denying a motion for new trial will not be set aside unless there was an abuse of discretion that resulted in prejudicial error."  (*Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 8; see *Hall v. Goodwill Industries of Southern California* (2011) 193 Cal.App.4th 718, 730.)  In reviewing an order denying a new trial, "we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial."  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872.)  We review for abuse of discretion the trial court's decision whether to admit juror declarations on the issue of jury misconduct.  (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.)

　　2.　*Juror and attorney declarations alleging misconduct*

The City submitted a declaration from Juror No. 8 stating the jury reached its damages award of $4 million, not based on the evidence of Carranza's emotional distress, but rather by starting with Carranza's attorney's request during closing arguments for an $8 million damages award, and then working backwards to the $4 million figure by holding votes at increments of $500,000 until nine members of the jury agreed.  After

27

agreeing to a total damages amount, the jury decided to allocate more of the $4 million to future damages after one juror, a nurse, opined a larger future damages award was appropriate because "she has had patients in her practice who come in, and she knows that [Carranza] will need more medical care in the future, which will be expensive." The jury also "at one point near the end of deliberations discussed deductions that would be made to the verdict amount, including that 30-40% of the verdict amount would go to [Carranza's] attorneys to pay for attorneys' fees and that taxes may be taken out of the verdict amount."

Juror No. 8 also declared that Juror No. 3 "made statements that inserted information that was not presented at trial." She relayed that Juror No. 3 stated "the photograph must have been distributed more than what the evidence presented at trial showed," and " 'of course' everyone in the LAPD saw or knew about the photograph and that it went around to everyone." She further reported Juror No. 3 "also stated that there was a 'brotherhood' in the LAPD, so that no one would talk about the photograph, say they saw the photograph, or give names." The City also submitted a declaration from its attorney, Fabiola Rivera, who recounted a conversation she had with Juror No. 3 after the verdict, in which Juror No. 3 said it was " 'obvious' that the photo was 'everywhere' and 'must have been widely distributed.' " Rivera also relayed that Juror No. 3 stated the case would " 'force the City/Department to change its policies.' "

In opposition, Carranza submitted a declaration from Juror No. 3, who stated that his observations that the photo was distributed widely throughout the LAPD and that there was a brotherhood in the LAPD were based on the evidence presented at trial, including the "one or more witnesses who said that

28

people were afraid to come forward and disclose their knowledge of the photo."

3. *The trial court did not abuse its discretion in determining portions of the declarations were inadmissible and that they did not show misconduct*

The trial court did not abuse its discretion in determining the declarations the City submitted do not establish juror misconduct.

First, much of the declaration of Juror No. 8 is inadmissible under Evidence Code section 1150 because it reflects the jury's mental processes and reasoning to reach its verdict. This includes Juror No. 8's description of the jury's voting process and allocation of past and future damages, which boils down to evidence of the jurors' mental processes in reaching the damages award. (See *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1605 [juror affidavits that "attempted to show how the jurors arrived at the damages figures . . . explained the jurors' collective mental processes and, as such, were inadmissible"].) In any event, the declaration's description of the voting process to arrive at the damages award does not show misconduct. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 819 [rejecting allegation of misconduct based on claim that jury used "an arbitrary and flippant process of assessing damages by voting on various numbers proposed without regard to the evidence"].)

While Juror No. 8 stated the possibility of attorney fees and taxes affecting Carranza's damages award was referenced "at one point near the end of deliberations," she does not allege an "express agreement by the jurors to include such fees in their verdict, or extensive discussion evidencing an implied agreement to that effect," which would "constitute[] misconduct requiring

29

reversal." (*Krouse v. Graham* (1977) 19 Cal.3d 59, 80-81; compare *Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741 [declaration recounting that one juror recommended an award take into account "the attorney's probable percentage of the recovery and taxes" and another juror stated 40 percent of an award would go to the attorney did not establish an express or implied agreement to include such fees in the verdict and thus was inadmissible] with *Tramell v. McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172-173 [misconduct occurred where "extensive discussion among the jurors evidenced an implied agreement to inflate their verdict to compensate for attorney fees and taxes"].) Without allegations of such an express or implied agreement, the declaration merely "recite[s] the reasoning process the jury employed during deliberations to arrive at its damages figures. . . . As such, the [declaration] reflected the jurors' subjective mental processes and constitute[s] inadmissible evidence to impeach a verdict." (*Fergus v. Songer* (2007) 150 Cal.App.4th 552, 569, fn. 5; accord, *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1684 [where declarations "do not suggest an express or implied agreement" by jurors to violate court's instructions and recite "only the reasoning process of the jurors during deliberations," declarations were inadmissible to impeach the verdict].)

With respect to Juror No. 8's and Rivera's declarations recounting Juror No. 3's statements that the photo was "everywhere" and had to have been distributed more widely than the evidence showed, and that LAPD's silence stemmed from a "brotherhood," the City incorrectly asserts these statements reveal Juror No. 3 harbored an undisclosed bias against LAPD. The City relies on *Grobeson v. City of Los Angeles*, *supra*,

30

190 Cal.App.4th 778, but that case is inapposite. There, the juror stated unequivocally, " 'I made up my mind during trial,' " which the court determined "was a 'statement of bias' — actually, it showed that she had prejudged the case." (*Id.* at pp. 790, 792.) Similarly, in *Enyart v. City of Los Angeles*, *supra*, 76 Cal.App.4th at pp. 510-511, the jurors expressed general opinions during deliberations that the LAPD " 'regularly and routinely "screws over" people' " and " 'always hide things and are untruthful, in [the jurors'] opinion and based on their own life experiences.' " (Italics omitted.) The court determined those statements showed preconceived bias against the LAPD, unconnected with and unsupported by the evidence presented at trial. (*Id.* at p. 511.)

Here, by contrast, Juror No. 3's statements assuming widespread distribution of the photo were consistent with the testimony from Munoz and Eppolito that the photo had been widely shared and discussed within LAPD, and the Department's own investigatory conclusion that "the photograph was circulated throughout the Department." Juror No. 3's assertion about a "brotherhood" amongst LAPD officers also "came within the range of [the] permissible interpretations" from evidence at trial that officers could be afraid to come forward and that an LAPD officer refused to turn over his phone to the investigators. (*People v. Steele* (2002) 27 Cal.4th 1230, 1266.) Because Juror No. 3's statements were based on reasonable inferences from the evidence presented at trial, they neither injected new facts not presented during the trial nor reflected undisclosed bias against the LAPD.

Likewise, while Rivera's declaration recounted that Juror No. 3 stated after the verdict was rendered that the case would " 'force the City/Department to change its policies,' " such

31

statements do not show that he harbored undisclosed, preexisting bias against LAPD. Juror No. 8 was entitled to form opinions based on the evidence he heard. Nor do the declarations proffered by the City demonstrate the jury agreed to its verdict on liability or damages because it wanted to send a message to the LAPD, as opposed to basing its verdict on the evidence. (See *Iwekaogwu v. City of Los Angeles*, *supra*, 75 Cal.App.4th at pp. 819-820 [one juror's statement "that the damages award should set an example and send a message to the City," without more, "do[es] not establish either an express agreement to include exemplary damages in the verdict or that there was extensive discussion of the topic"].)

Finally, the City focuses on Juror No. 8's report that a nurse on the jury stated during deliberations that more of the award should be allocated to future damages because she knew from experience that Carranza would need expensive medical care in the future. The City contends these statements were misconduct because they injected external information based on the nurse's specialized knowledge into the deliberations.

"A juror may not express opinions based on asserted personal expertise that [are] different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (*People v. Steele*, *supra*, 27 Cal.4th at

p. 1266.) "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which [is] misconduct." (*Ibid.*; accord, *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 76 [" 'Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work.' "]; *People v. Engstrom* (2011) 201 Cal.App.4th 174, 185 ["Jurors ' "must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts." ' "].)

The nurse's statements did not constitute juror misconduct. First, her statement that medical care is expensive did not draw on her specialized medical training as a nurse, because it is common knowledge that medical care is expensive. (Cf. *Nodal v. CalWest Rain, Inc.* (2019) 37 Cal.App.5th 607, 611 [juror's statements drawing from his experience as a pipefitter and a farmer regarding industry standards and causation (and contradicting jury instructions) were improper because they were based on specialized information obtained from outside sources].) Second, the nurse's opinion that Carranza would need more medical care in the future was consistent with the evidence presented at trial that Carranza would need extensive treatment for at least six years. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 649 [" ' "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial"]; see *id.* at p. 650 [concluding no juror misconduct occurred where nurse's explanations during deliberations about medical issues relating to blood pressure and

circulation were consistent with trial testimony of medical expert].)

Because the City's declarations, to the extent they contain admissible evidence, do not establish any juror misconduct, the court properly denied the City's motion for a new trial.

C.    *The Attorney Fee Award Was Proper*

The City contends that the attorney fee award must be reversed, challenging both the hourly rate awarded to Smith and the multiplier applied to fees for Smith and his colleague Leila Al Faiz.  We find no error.

1.    *Applicable law and standard of review*

"Section 12965 authorizes an award of attorney fees to the prevailing party in an action under FEHA:  'In civil actions brought under this section, the court, in its discretion, may award to the prevailing party . . . reasonable attorney[ ] fees and costs.'  Because fee awards to prevailing FEHA plaintiffs promote the important public policy in favor of eliminating discrimination in the workplace [citation], a ' "prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' " ' "  (*Vines v. O'Reilly Auto Enterprises, LLC* (2022) 74 Cal.App.5th 174, 182, fn. omitted (*Vines*).)

Courts use the lodestar method to calculate attorney fees in FEHA cases.  (*Vines, supra*, 74 Cal.App.5th at p. 182.)  " 'The lodestar amount is simply the product of the number of hours spent on the case, times an applicable hourly rate.' "  *(Ibid.*; accord, *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1132 (*Ketchum*).)  " '[T]he lodestar method vests the trial court with the discretion to decide which of the hours expended by the

34

attorneys were "reasonably spent" on the litigation' [citation], and to determine the hourly rates that should be used in the lodestar calculus." (*Mikhaeilpoor v. BMW of North America, LLC* (2020) 48 Cal.App.5th 240, 246-247.) " ' "The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative ' "multiplier" ' based on a variety of factors." ' " (*Vines*, at p. 182.)

"We review an attorney fee award under FEHA for an abuse of discretion. (*Vines*, *supra*, 74 Cal.App.5th at p. 184.) " '[A]n experienced trial judge is in a much better position than an appellate court to assess the value of the legal services rendered in his or her court, and the amount of a fee awarded by such a judge will therefore not be set aside on appeal absent a showing that it is manifestly excessive in the circumstances.' " (*Gutierrez v. Chopard USA Ltd.* (2022) 82 Cal.App.5th 383, 393.)

2. *The attorney fee award*

In her motion for attorney fees, Carranza requested a lodestar amount of $756,928.50, enhanced by a 1.5 multiplier, for a total of $1,135,392.75. Carranza's requested lodestar was based on 170.9 hours at $1,000 per hour for Smith and 613.96 hours at $600 per hour for Al Faiz, in addition to work by two other attorneys in Smith's firm. The City argued that the hourly rates, number of hours, and multiplier sought were excessive.

Based on Smith's "experience in this type of litigation, the case's unusual facts, the issues of evidence involved, the lengthy time between when services were performed and when fees are awarded, and the contingent nature of the case," the court set his rate at $950 per hour for 157 hours. The court credited Al Faiz with handling most of the pretrial work, including opposing

35

summary judgment and managing discovery.  It reduced her hours for excessive time on written discovery and for unsuccessful motions, awarding her 563 hours at $500 per hour. As to the other attorneys, the court disregarded a chart of rates because it did not account for practice area or location and noted it gave "only modest weight" to the fees granted by other judges. The court reduced the rates for two of Carranza's other attorneys—from the requested $850 to $525 per hour for one, and from $700 to $500 per hour for the other.  It also reduced their billed hours, for one by approximately 70 hours and for the other by four hours.

The court applied a 1.2 multiplier only to the work of Smith and Al Faiz, "based on the experience and efficiency of the work performed by Mr. Smith, and the skill exhibited by Ms. Al Faiz over a lengthy pretrial period."  The multiplier was "not based on the contingent risk presented, because that factor was considered in determining the hourly rate for [Carranza's] counsel should be higher than the rate for noncontingent work for attorneys of the same experience and skill."

In total, the court awarded Carranza $610,050 in attorney fees, reducing her request by $525,342.75.

3. *The court did not abuse its discretion in awarding Smith's hourly rate*

The City contends the $950 hourly rate awarded to Smith was excessive and an abuse of discretion.  A reasonable hourly rate is generally the prevailing rate charged by attorneys of similar skill and experience in the relevant community.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096.)

"[T]he trial court is in the best position to value the services rendered by the attorneys in his or her courtroom [citation], and

this includes the determination of the hourly rate that will be used in the lodestar calculus.  [Citation.]  In making its calculation, the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees [citation], the difficulty or complexity of the litigation to which that skill was applied [citations], and affidavits from other attorneys regarding prevailing fees in the community and rate determinations in other cases."  (*569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal App.5th 426, 436-37.)  The hourly rate applied by the court may take into account that the attorney took the case on contingency, so long as that factor is not also used in determining the multiplier.  (See *Horsford v. Board of Trustees of California State Univ.* (2005) 132 Cal.App.4th 359, 395 ["The contingency adjustment may be made at the lodestar phase of the court's calculation or by applying a multiplier to the noncontingency lodestar calculation (but not both)."].)

Carranza sought $1,000 per hour for Smith.  The trial court awarded $950 per hour "based on Mr. Smith's experience in this type of litigation, the case's unusual facts, the issues of evidence involved, the lengthy time between when the services were performed and when fees are awarded, and the contingent nature of the case."

The City argues the court failed to analyze the prevailing rate in the community.  But the court's comments at the hearing reflect its understanding of the governing standard.  It acknowledged that setting a rate requires evaluating an attorney's experience and results, and stated it was "guided in part, but not entirely, by past awards."  Although it did not explicitly invoke the phrase "prevailing market rate," its

37

reference to comparable awards and rate charts shows it understood and applied the correct framework.  The court also properly rejected the City's proposed benchmark—rates paid to its own counsel—explaining that such rates were not comparable because they reflected steady work, not contingent-fee litigation. (See *Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 40 [rejecting claim that hourly rates of plaintiff's attorneys should be limited to the lower hourly rates charged by defense attorneys, given plaintiff's attorneys worked under contingency arrangements and defense attorneys did not].)

The court relied in part on Smith's declaration that his standard rate, based on his experience in employment litigation, was $1,000 per hour.  (See *Pollock v. Kelso* (2025) 107 Cal.App.5th 1190, 1197 ["Trial courts certainly are not bound to accept lawyers' self-interested declarations of their own worth. . . .  But this trial court compared these declarations with what it knew of these lawyers' performances in this case.  The court exercised reasonable discretion in accepting this evidence."].)  Another judge in Los Angeles County had recently awarded Smith that rate in February 2023.  Carranza also submitted declarations from two experienced local attorneys who stated, based on their knowledge of prevailing rates in Los Angeles for similar litigation, that $1,100 to $1,200 would be appropriate for Smith.  In addition, Carranza submitted the Laffey Matrix, which suggested an hourly rate of $997 for an attorney of Smith's seniority.

Although the City presented competing evidence based on the Real Rate Report, suggesting the rate for Smith should be within the range of $566 to $870 per hour, the trial court was entitled to use a higher rate, unless ' " 'it [was] clearly wrong.' " ' "

(*569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc.*, *supra*, 6 Cal.App.5th at pp. 439-440 [affirming trial court's determination of appropriate hourly rate where conflicting affidavits concerning appropriate hourly rates were submitted by the parties].)  We conclude the court did not abuse its discretion in fixing Smith's hourly rate at $950.

    4.    *The court did not abuse its discretion in awarding a multiplier to Smith and Al Faiz*

The City contends the 1.2 multiplier awarded to Smith and Al Faiz resulted in a double recovery and was unwarranted.  "In most contingency cases, courts . . . increase the lodestar amount by applying a multiplier.  [Citation.]  The purpose of the multiplier is to reward the prevailing attorney with an increased fee in light of" the factors articulated in *Ketchum*, *supra*, 24 Cal.4th 1122.  (*Caldera*, *supra*, 48 Cal.App.5th at p. 607.)  Those factors are "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award."  (*Ketchum*, at p. 1132.)  Here, Carranza requested a 1.5 multiplier for all her attorneys.  The court applied a 1.2 multiplier to the work of Smith and Al Faiz only, "based on the experience and efficiency of the work performed by Mr. Smith, and the skill exhibited by Ms. Al Faiz over a lengthy pretrial period."  The multiplier did not include the contingent nature of the representation of Carranza, because the court relied on that factor in setting Smith's hourly rate.

The City argues the multiplier applied for Smith resulted in double recovery because the trial court had already factored in his " 'experience and efficiency' " when setting his hourly rate.

(See *Ketchum, supra,* 24 Cal.4th at pp. 1138-1139 ["The factor of extraordinary skill, in particular, appears susceptible to improper double counting . . . a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation."].) The court cited Smith's "experience in this type of litigation" among the factors justifying Smith's hourly rate of $950, and "the experience and efficiency of the work performed by" Smith in setting the 1.2 multiplier.

Although the court used the word "experience" in discussing both Smith's hourly rate and the multiplier, it appears the court used the term to refer to different elements — years of experience for determining the appropriate hourly rate versus skill, efficiency and quality of representation for setting the multiplier. Although related, these factors are distinct and did not result in double recovery.

*Sonoma Land Trust v. Thompson* (2021) 63 Cal.App.5th 978 is instructive. There the defendant argued the court improperly used the same factor of the attorneys' skill to justify both the lodestar and the multiplier. (*Id.* at pp. 977-978.) The court found that although double counting is not permitted under *Ketchum*, factors like the attorneys' skill can "contribute to both a lodestar and an enhancement." (*Id.* at p. 988.) The court explained: "A skilled attorney commands a higher fee . . . which [is] ordinarily built into the lodestar. [Citation.] An enhancement is proper, however, when these factors, though partially reflected in the lodestar, are not fully reflected in the lodestar, such as when the attorney displays an extraordinary

40

level of skill that justifies a higher fee. . . .  The factors may overlap in a general sense, but an enhancement focuses on something *extra*."  (*Ibid*.; see also *Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 61 [finding no duplication of factors because "a lodestar enhancement based on 'quality of representation' by definition involves considerations not captured by counsel's hourly rates].)  Here the court highlighted the "experience and efficiency" of Smith's work on the case in calculating the multiplier, which was not fully captured in the hourly rate.

Moreover, the trial court here was aware of the danger of double recovery — it expressly stated it was *not* basing the multiplier on the contingent nature of the case, because that had already been factored into Smith's rate.  (See *Sonoma Land Trust v. Thompson*, *supra*, 63 Cal.App.5th at p. 988 [presumption that trial court did not double count was supported by the fact that the court had been "careful to state, repeatedly, that it understood the rule against double counting"].)  Absent contrary evidence, we presume the court properly considered and applied the *Ketchum* factors.  (See *Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378 ["in reviewing the trial court's attorney fee award . . . ' "[w]e presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise" ' "].)

The City next contends the 1.2 multiplier for Al Faiz was unsupported because her performance was not extraordinary, there was a different judge for pretrial proceedings, and some of her work was criticized Smith.  The City relies on the fact that after Smith took over the case from Al Faiz close to trial, he expressed disagreement with the approach she had taken, stating there was "a simple way of trying the case."  He criticized the

quality of both sides' briefing, disavowed the arguments made by Al Faiz who no longer worked for him, and told the court, "that's not what I'm going to be doing." Smith also called the 80-person witness list "ridiculous," saying he planned to call no more than 10 witnesses.

The trial court acknowledged it did not personally observe all of Al Faiz's work but had conducted a "thorough review" of her pretrial filings, including her successful opposition to the City's summary judgment motion. After making substantial reductions to her claimed hours, the court concluded her written work demonstrated sufficient skill to warrant a multiplier. Smith's criticism of some of her work does not undermine the court's independent assessment. Applying the 1.2 multiplier to Al Faiz's work was not an abuse of discretion.

## DISPOSITION

The judgment and order regarding attorney fees are affirmed.


                                        STONE, J.

We concur:


    MARTINEZ, P. J.


    FEUER, J.